UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


HARVEY HOLCOMB,

                    Plaintiff,

vs.                                    No. 13-CV-01102
                                           AWI-SKO

JERRY RAMAR, A MODESTO
POLICE OFFICER, OFFICER
KROUTIL, A MODESTO POLICE
OFFICER, OFFICER COX, A
MODESTO POLICE OFFICER,
OFFICER BOTTOMS, A MODESTO
POLICE OFFICER, OFFICER
CICCARELLI, A MODESTO
POLICE OFFICER, etc., et al.,

                    Defendants.



DEPOSITION OF JERRY RAMAR


Date:          Wednesday, August 12, 2015

Time:          10:05 a.m.

Location:      Tracy Law Center
               120 East 12th Street
               Tracy, CA 95376


Reported by:   Howard Schroeder, CSR
               License Number 1123


#50207

1    understand it, you should respond to the question.

2    And then my objection reserves the issue later

3    that the judge is going to rule on it.

4              THE WITNESS:  All right.

5              MR. LOEBS:  I think that fairly states

6    the point.  We should proceed.

7              So I saw you pausing and looking to me

8    if you should answer or not.  I want to make sure

9    that you understand.

10             THE WITNESS:  That was proper.  I was

11   waiting for you to tell me whether to answer or

12   not to answer.

13   Q    BY MR. BOSKOVICH:  Go ahead.  Do you remember

14   the question?

15   A    Let me rephrase the question or try to say

16   exactly how you did and then I will answer it.

17             And your question was, as a member of

18   MNET, was our -- was it primarily our function for

19   people not to know --

20   Q    Correct?

21   A    -- you were a police officer.

22             And that is dependent on what were doing

23   at that time.

24   Q    All right.  But you -- at the time of the

25   incident, I think you said you were driving a 2005

1      Nissan Altima; is that correct?

2      A      That's correct.

3      Q      Was that in pristine condition?

4      A      No.

5      Q      So -- and you were -- I think, you know, you

6      would typically dress in plainclothes, T-shirt,

7      you know, shorts or jeans or something; correct?

8      A      That's correct.

9      Q      And badge.  You know, other than executing

10     something like a search warrant where you were

11     actually doing it, you wouldn't have your badge

12     displayed when you were on duty; correct?

13             MR. LOEBS:  Objection.  Incomplete

14     hypothetical.  Vague.

15             THE WITNESS:  That's correct.

16     Q      BY MR. BOSKOVICH:  It would be -- it would be

17     accurate to say that unless you were actually

18     doing an enforcement procedure, you would not want

19     exposure as being a police officer; correct?

20             MR. LOEBS:  Objection.  Vague as to what

21     you mean by "enforcement procedure".

22             MR. BOSKOVICH:  Executing a search

23     warrant, making an arrest, something like that.

24             MR. LOEBS:  Objection, vague as to

25     "something like that".

1    could make an accurate estimate of speed, an

2    accurate visual estimate of speed?

3              MR. LOEBS:  Objection.  Vague.

4    Incomplete hypothetical.

5              THE WITNESS:  You're going to have to

6    rephrase that.

7    Q    BY MR. BOSKOVICH:  Did -- as a part of your

8    training, were you told that you needed, in order

9    to make an accurate estimate of speed, that you

10   needed a certain amount of time to be able to

11   accurately do that?

12             MR. LOEBS:  Objection.  Vague,

13   incomplete hypothetical.

14             THE WITNESS:  No.

15   Q    BY MR. BOSKOVICH:  Were you told that you

16   could make an accurate estimate of speed in a

17   split second?

18             MR. LOEBS:  Objection.  Vague as to what

19   you mean by "split second".

20             THE WITNESS:  Nobody specifically said

21   that, no.

22   Q    BY Mr. BOSKOVICH:  Was it your understanding

23   that you could make an accurate estimate of speed

24   in a split second?

25   A    No.

1    A    It was in the computer, so you could consider

2    that in writing, yes.

3    Q    To your knowledge, is it saved?

4              MR. LOEBS:  Objection.  Calls for

5    speculation.

6              THE WITNESS:  I would say it's saved.

7    Q    BY MR. BOSKOVICH:  All right.  On May the 7th

8    of 2012, how were you dressed when you came into

9    work?

10   A    I had -- I was wearing plainclothes.  So I

11   was either in a T-shirt or jeans or a T-shirt and

12   shorts.

13   Q    Which was it?

14   A    I don't recall.

15   Q    Did you have a badge on?

16   A    That's vague.  What -- what do you mean by

17   "on"?

18   Q    On your person.  Did you have a badge on your

19   person?

20             MR. LOEBS:  Objection.  Vague as to

21   time.

22   Q    BY MR. BOSKOVICH:  When you came in to work

23   on May the 7th of 2012, did you have a badge on

24   your person?

25   A    Yes.

```
1    Q    Where was it?

2    A    My wallet.

3    Q    All right.  Did you have a firearm?

4    A    Yes.

5    Q    Where was your firearm?

6    A    On myself.

7    Q    Was it concealed?

8    A    Yes.

9    Q    All right.  Under the -- under the shirt?

10   A    Yes.

11   Q    What type of shoes were you wearing?

12   A    I don't recall.

13   Q    Did you drive in to work that morning?

14   A    Yes.

15   Q    What was the traffic like?

16   A    It's general Modesto traffic, nothing out of

17   the ordinary.

18   Q    Is that an assumption or a memory?

19   A    Memory.

20   Q    OK.  What time did you get in?

21   A    I don't recall.

22   Q    What did you have for breakfast that morning?

23   A    I don't recall.

24   Q    Did you eat breakfast?

25   A    I don't recall.
```

1     Street?

2     A     To make a left turn and go east on F Street.

3     Q     All right.  As you were driving out, where

4     did you first come to a complete stop?  And if you

5     can mark that with an X and then draw an arrow and

6     write on the white part "complete stop".

7     A     You said an X?

8     Q     Yeah.  Put an X where you first came to a

9     complete stop.  And draw an arrow into the white

10    somewhere and write "complete stop".

11          How many pedestrians did you see when

12    you came to a complete stop?

13    A     None.

14    Q     In your police report you indicated a danger

15    to pedestrians.  Do you recall that?

16    A     Yes.

17    Q     Was that inaccurate?

18    A     No.

19    Q     If there were -- if there were no pedestrians

20    how were they endangered?

21          MR. LOEBS:  Objection.  Vague as to his

22    testimony.  Argumentative and misrepresents the

23    police report.

24          MR. BOSKOVICH:  You can answer.

25          THE WITNESS:  It is common for there to

1   be numerous pedestrians around the Police

2   Department, especially here on F Street.  We have

3   a large, homeless population that frequents that

4   area that's commonly walking on the sidewalks and

5   then in the streets and in the intersection.

6   Q    But there were none?

7   A    Not that I recall.

8   Q    OK.  Were there vehicles parked in that

9   diagonal parking?

10  A    Yes.

11  Q    Describe them?

12  A    I don't recall the exact description of the

13  vehicles.

14  Q    Was there an SUV?

15  A    I don't recall.

16  Q    So maybe yes, maybe no?

17  A    Yes.

18  Q    A pickup that was raised?

19  A    Maybe.

20  Q    What was your visibility when you came to a

21  complete stop?  What could you see?

22  A    I could see nearly all the way to the

23  intersection.  Not all the way, but I would say

24  about that far.

25  Q    How far out was -- so your -- the hood of

DEPOSITION OF JERRY RAMAR        141

1   your car had to be completely out into the street;

2   correct?

3   A    No.

4   Q    Well, how can you -- if you had vehicles

5   parked --

6          MR. BOSKOVICH:  Let me mark this, if I

7   could, as Exhibit 5.

8          (Whereupon, Plaintiff's Exhibit 5 was

9   marked for identification.)

10          MR. BOSKOVICH:  And I'm going to ask you

11   if you recognize this location.

12          MR. LOEBS:  Wait a second.  Let me see

13   the document.

14   Q    BY MR. BOSKOVICH:  Do you recognize what this

15   depicts?

16   A    Yes.

17   Q    What is it?

18   A    That's the intersection of F and 11th.  And

19   the building to the right would be the operations

20   building for the Police Department.

21   Q    Would you agree that that's an accurate

22   depiction of how vehicles are parked adjacent to

23   the administration building?

24          MR. LOEBS:  Objection, vague.  Lack of

25   foundation of this photograph.  Calls for

1    another?

2    A    No.

3    Q    OK.  What did you do next?  How long -- OK.

4    Let me back up.

5            How long did you remain at a complete

6    stop?

7    A    Long enough to clear to the right and to the

8    left.

9    Q    How long is that?

10   A    A second or two.

11   Q    A second or two.  What did you do next?

12   A    Proceeded to make a left turn.

13   Q    All right.  So you proceeded into the

14   intersection.  All right.  Into the street?

15   A    That's accurate.

16   Q    Did you -- OK.  And you were going to make a

17   left-hand turn; is that correct?

18   A    Yes.

19   Q    Please indicate on Exhibit 4 where you were

20   when you first saw Mr. Holcomb's vehicle?

21   A    Any particular way?  Can I just --

22   Q    Any way because you're going to draw with an

23   arrow and say, "First saw Holcomb's vehicle."  OK.

24   Indicate where Mr. Holcomb's vehicle was.

25   A    Right there (indicating).

1    Q    Please draw an arrow to it and put first --

2    you know, Holcomb's vehicle, first saw.  Just so

3    we know.

4              OK.  Can I look at that the exhibit if

5    you're done?

6    A    Oh, I just want to make sure I didn't

7    miswrite something.

8    Q    OK.  That's fine.  Take your time.

9              MR. LOEBS:  Tony, when we have a

10   convenient break.

11             MR. BOSKOVICH:  Sure.  I'll just have a

12   few more questions.

13             MR. LOEBS:  Sure.

14             MR. BOSKOVICH:  OK.

15   Q    BY MR. BOSKOVICH:  Do you have an estimate of

16   how far away Mr. Holcomb's vehicle was from you

17   based upon that representation?

18   A    Not without measuring it properly, no.

19   Q    Well, take a look.  Do you have an estimate

20   as you're sitting here today how far away he was?

21   A    If -- if you're saying that's 120 feet, I

22   would say it's probably a little less than half of

23   that.

24   Q    Look underneath, right under the photographic

25   depiction, do you see a scale --

```
 1    Q    Did you think you were going to get hit?

 2    A    Not necessarily.

 3    Q    Did you feel you were in danger?

 4    A    I thought he was going fast.

 5    Q    Did you feel that you were in danger?

 6    A    Not necessarily.

 7    Q    Were you startled when you saw him?

 8    A    Yes.

 9    Q    Uh-huh.  Were you looking at him full on?  I

10    mean, were you like in a position where you were

11    going to be T-boned by him?

12    A    By the time I got my vehicle stopped if he

13    had not stopped, yes, he would have T-boned me.

14    Q    Why did you stop?

15    A    Because he was coming fast.

16    Q    I understand that.  But you put -- didn't you

17    put yourself in more danger rath than gunning it

18    to get out of the way?

19    A    No.

20    Q    Why not?

21              MR. LOEBS:  Objection.  Argumentative.

22              THE WITNESS:  I don't know what he is

23    going to do.

24    Q    BY MR. BOSKOVICH:  You knew that his vehicle

25    was heading straight for you; correct?
```

1    A     He was headed -- yes.

2    Q     At a high rate of speed?

3    A     I wouldn't call it a high rate of speed.   I

4    would call it excessive speed.

5    Q     OK. Have you been trained as to what the

6    stopping distance of a Toyota Rav 4 is at 35 miles

7    an hour?

8    A     No.

9    Q     Could you sit here and disagree that at 35

10   miles an hour, a Toyota Rav 4 takes 43 feet to

11   stop?

12   A     I'm not going to argue that.

13   Q     OK.  So you don't know one way or the other?

14   A     No.

15   Q     When you got into that intersection and you

16   looked to your left, what did Mr. Holcomb do?

17   A     He -- he applied the brakes and stopped.

18   Q     Did he skid?

19   A     Not that I'm aware of.

20   Q     How much time did you have to make a

21   visual -- how much time did you have to make a

22   visual estimate of his speed?

23   A     I couldn't put a time frame on it.  It was

24   quick.

25   Q     Under a second, correct?

1    A    Yes.

2    Q    You see that this is under penalty of

3    perjury; correct?  Do you see that?

4    A    Yes.

5    Q    And you say that he was going at

6    approximately -- that he was 35 in a 25

7    mile-an-hour zone?

8    A    Yes.

9    Q    That's not what you said in your police

10   report, is it?

11            MR. LOEBS:  Objection.  Argumentative.

12            THE WITNESS:  I put 30 in the police

13   report.

14   Q    BY MR. BOSKOVICH:  Why the difference?

15   A    He was going between 30 and 35 was my best

16   estimate.

17   Q    And in that split second, you could make that

18   determination?

19   A    Yes.

20            MR. BOSKOVICH:  We can take a break now.

21            MR. LOEBS:  OK.  Thanks.

22            (Recess taken from 2:50 p.m. to 2:5 8

23   p.m.)

24   Q    BY MR. BOSKOVICH:  Showing you what I have

25   marked as Exhibit 7 to your deposition.

1    something that's all private and unrelated to this

2    case, then before we discuss that, we will take a

3    step outside.  I don't know what the answer might

4    be.  If it's something -- if you are at all

5    uncomfortable in the setting, we'll step outside

6    because it's an inappropriate question as broad as

7    it is.

8              THE WITNESS:  Can we step outside?

9              MR. BOSKOVICH:  Yeah.

10             (The witness and his attorney exited the

11    proceedings.)

12             MR. LOEBS:  If you could limit the

13    question to perceptions of distances that he's

14    made as his work as a police officer, I think that

15    would -- that would narrow it.  I don't think

16    you're asking when he was 12 if he thought

17    something was 20 feet away and it was only ten, if

18    that's really relevant here.

19             MR. BOSKOVICH:  I asked him in his adult

20    life if that has ever happened.

21             THE WITNESS:  In my adult life I had one

22    incident where my depth perception was wrong, yes.

23    Q    BY MR. BOSKOVICH:  What happened?

24    A    I watched her.  I killed a two-year-old.  And

25    I had to shoot her.  And I thought the distance

1    that you're not aware that there was any skid;

2    correct?

3    A    Correct.

4    Q    Your car did not leave any skid, as far as

5    you know?

6    A    No.

7    Q    When he came to a complete stop, how far away

8    was he from you?

9    A    A car length or less.

10   Q    OK.  And you said a car length is 20 feet?

11   A    Approximately.

12   Q    Do you have an estimate of whether you can do

13   any better than that, a car length or less?

14   A    No.

15   Q    As Mr. Holcomb was approaching you and

16   stopping, what was going through your mind?

17   A    He's -- he is going to stop or go around me.

18   Q    Not hit you?

19   A    I was hoping he wouldn't hit me.  That was

20   also going through my mind.

21   Q    OK.  When he came to a stop, what was your

22   demeanor?

23   A    Unchanged.

24   Q    Unchanged?  Flat?

25   A    Basically.

1    he came to a complete stop until -- well, let me

2    ask you this:   When he pulled up to your vehicle,

3    did he come to another complete stop?

4    A    Can you --

5    Q    As you were -- OK.   My understanding of the

6    testimony, correct me at any point, he came to a

7    stop and then he accelerated again towards your

8    vehicle.   Did he come to a complete stop while

9    your vehicle was still in harm's way?

10   A    Yes.

11   Q    All right.   How far away did he stop?

12   A    Closer.   But I don't know.

13   Q    Did you see the look on his face when he did

14   that?

15   A    Yes.

16   Q    What was it?

17   A    I believe he was screaming.

18   Q    All right.   Is that reflected in your report?

19   A    Can I review my report?

20   Q    Oh, you will have -- you can review anything

21   you want.

22   A    OK.   Now that I'm reviewing the report, I put

23   here -- you said that I stated he was going 30

24   miles per hour.   And actually, in my report I

25   write I estimated that his speed was over 30,

1   Q   All right.  Do you have -- can you give me a

2   range?

3   A   No.

4   Q   Was your vehicle moving at the time that

5   he -- that he was -- that he moved forward that

6   second time?

7   A   It may have been.

8   Q   How long was he stopped the first time

9   before -- before he then proceeded to move forward

10   the second time?

11   A   A brief moment.

12   Q   More than a second?

13   A   Approximately one second.

14   Q   OK.  At that time, after he came to a stop

15   and you were in the -- you were in the street, you

16   were impeding traffic; correct?

17   A   At that point, yes.

18   Q   Yes?

19   A   He could not move forward.

20   Q   Nobody else could either, if they were there;

21   right?

22   A   No, not necessarily.

23   Q   OK.  So when he moved forward that second

24   time, did you consider that to be a Vehicle Code

25   violation?

DEPOSITION OF JERRY RAMAR          193

1    limit line.

2    A    Because he's staying there blocking the

3    vehicle during this time I'm preparing myself for

4    the stop.  So I have to clear the intersection

5    that I'm in to make sure that it's safe for me to

6    proceed and go back to him.

7              So I took my eyes off of him momentarily

8    to make sure that I didn't cause a collision in

9    the intersection that I was in.  By the time that

10   I got through the intersection I was proceeding in

11   my vehicle towards him.  His vehicle was already

12   pulled over to the side.

13   Q    I understand that.  How much time elapsed

14   between the time you lost sight of Mr. Holcomb and

15   the time that you regained it?

16   A    That's just a brief moment.  Just enough time

17   to clear the intersection.  So a couple of

18   seconds.

19   Q    Just a couple of seconds.  So you were

20   watching him.

21             So what did you do in the period of time

22   from when you completed your left-hand turn and

23   drove to the intersection of F and 11th?

24   A    I continued to watch him.  I also put on

25   my -- my bulletproof vest and my raid vest.

DEPOSITION OF JERRY RAMAR        207

1    A    It was in my pocket.

2    Q    Where?

3    A    In the trunk.

4    Q    It was in the trunk.  OK.  So what was

5    your -- you were going to make an enforcement

6    stop.  What was your intent?  What were you going

7    to do specifically?

8    A    My intent in doing the enforcement stop is

9    to -- was to see if he's in any emergency, if

10   there's something he needed help with.  And if

11   there was a legal reason for him to be driving the

12   way he was.  And if there was, I would render him

13   aid and get him what he needed.  And if there

14   wasn't a legal reason for him to do it, issue him

15   a citation.

16   Q    So when you got out of the car, you took your

17   ticket book with you; correct?

18   A    No cop takes their ticket book with them.

19           MR. LOEBS:  Just answer his question of

20   whether you --

21           MR. BOSKOVICH:  Let him finish it.

22           MR. LOEBS:  Well, I'm just saying, I

23   want him to answer your question.

24   Q    BY MR. BOSKOVICH:  Now, you made the U-turn,

25   right?  Your intention was to make a traffic stop,

DEPOSITION OF JERRY RAMAR          212

1    I looked.  I glanced through the windows to see if

2    there was somebody in the vehicle.

3    Q    Was there a wheelchair back there?

4    A    I learned that there was at a later time.

5    Q    I asked what you saw.  Was there a wheelchair

6    when you walked by the vehicle?  Did you see a

7    wheelchair in the cargo compartment of the Rav 4?

8    A    The first time that I saw the wheelchair was

9    when somebody had put it on the sidewalk by the

10   street.

11   Q    Do you dispute that that wheelchair came from

12   the cargo area of Mr. Holcomb's Rav 4?

13   A    Not at all.

14   Q    Do you dispute that that wheelchair was in

15   plain view in Mr. Holcomb's -- in the cargo area

16   of Mr. Holcomb's Rav 4?

17         MR. LOEBS:  Object to the question as

18   being vague as to "plain view".  Lack of

19   foundation.  Calls for speculation.

20         THE WITNESS:  Let me see if I remember

21   the question.

22         I believe that wheelchair was in the

23   back of that car.  I did not recall seeing it

24   until it was put on the sidewalk or on the street.

25   Q    BY MR. BOSKOVICH:  Are you contending that

DEPOSITION OF JERRY RAMAR          244

1    that vehicle, that wheelchair was concealed in any

2    way in -- in Mr. Holcomb's vehicle?

3    A    No, not at all.

4    Q    All right.  Would it be -- OK.  So you're

5    walking back and Mr. Holcomb is backing up;

6    correct?

7    A    Yes.

8    Q    As Mr. Holcomb, and you're telling him to get

9    back into his vehicle; correct?

10   A    Yes.

11   Q    And he's back.  So he's -- now he is in the

12   process of what could be interpreted as complying,

13   because he's walking back; correct?

14   A    I wouldn't call it complying, no.

15   Q    Well, how else was he going to get back into

16   the vehicle?

17            Oh, let me -- what would he have needed

18   to do once you gave him the command to get back in

19   his vehicle.  What would he have needed to do

20   before he actually got into the seat for you to

21   have considered him to be compliant?

22   A    For him to be compliant, when I said, "Go

23   back to your vehicle and sit down," I'm

24   paraphrasing because I don't remember the exact

25   words, but his instructions were to go back to the

DEPOSITION OF JERRY RAMAR          245

1    vehicle and take a seat in his vehicle.

2            For him not to be in violation of law,

3    he should have returned to the vehicle and sat

4    down so I can come up and address the situation

5    from there.

6    Q    He was walking backwards; correct?

7            MR. LOEBS:  Objection, vague as to time.

8    Q    BY MR. BOSKOVICH:  Your testimony was, as I

9    understood it, you were walking towards him and he

10   was retreating back towards his vehicle; correct?

11   A    That's how I would say he was retreating.  He

12   was not complying with my commands.

13   Q    How is that not compliance?  What did he need

14   to do while he was going back towards the driver's

15   seat of his vehicle?  What did he need to do to be

16   compliant with your command?

17           MR. LOEBS:  Objection.  Vague.

18           THE WITNESS:  Follow my commands the

19   first five or six times that I gave them to him.

20   Q    BY MR. BOSKOVICH:  I am not talking about

21   that.  I am talking about as he was retreating,

22   was he complying after that five or six times?

23   A    I don't want to be vague in my answer.  I

24   want to make sure I answer your question properly.

25   He retreats to his car.  And then I also had

                 DEPOSITION OF JERRY RAMAR        246

1      commands at the car.

2      Q    I'm trying not to interrupt you.  I apologize

3      for my facial.  I'm close to being done.

4      A    No, that's OK.

5      Q    I'm talking about while he's in motion

6      getting back to the driver's door, was the way he

7      was moving towards that door compliant?

8      A    I think it was more defiant than compliant.

9      Q    What's the difference?

10     A    The difference is somebody that complies is

11     going to do it because it's -- I'm sorry, it's

12     hard to -- he was defying my commands.  And he

13     was, when I say "was retreating", he was

14     retreating -- he was getting back to his vehicle.

15     I didn't feel like he was complying with my

16     commands to go back to the vehicle and sit down.

17     Q    Just not giving you enough respect?

18          MR. LOEBS:  Objection, misstates his

19     testimony.

20     Q    BY MR. BOSKOVICH:  Is that what it was?

21     A    No, no, not at all.

22     Q    Was he walking too slow?

23     A    No.

24     Q    Did he have a nasty look on his face?

25          MR. LOEBS:  Objection, vague as to time.

DEPOSITION OF JERRY RAMAR          247

1    what the problem is.  And if he didn't, then issue

2    him a citation.

3    Q    At this point, did you -- were you intending

4    to arrest him?

5    A    Based on his actions, yes, he was under

6    arrest at that point.

7    Q    When did you decide to arrest him?

8    A    When I told him to return back to his car and

9    he didn't the first few times.

10   Q    The first few times.  So you were going to

11   arrest him for 148, OK, before he ever got into

12   that door jamb?

13   A    Yes.

14   Q    So you didn't want him to go sit in that seat

15   so you could have a conversation and decide

16   whether you were going to give him a citation;

17   right?

18   A    That --

19   Q    When you were within arm's length?

20   A    He was going to be under arrest.  Whether I

21   booked him or not is a different story.  He

22   needed -- if there was something that he needed,

23   based on the way he was acting, then I was going

24   to get that aid for him.  Because the way he was

25   driving, I didn't know if he had -- I thought the

1    him into custody.

2    Q    Over what period of time?  How long did it

3    take from the time he pulled away until the

4    officers arrived?

5    A    Just a few seconds.

6    Q    OK.  What did you do with the handcuffs in

7    that intervening period of time?

8    A    Held on to them.

9    Q    With which hand?

10   A    I don't remember.

11   Q    All right.  So which officers arrived?

12   A    I may have put them back in my pouch.  I

13   don't recall what I did with them.

14   Q    How far away were you from him in this

15   intervening time?

16   A    Close enough that I could arrest him.

17   Q    Close enough where you could have gotten hit?

18   A    Yes.

19   Q    OK.  Close enough where you could have been

20   stabbed?

21   A    Yes.

22   Q    Now the -- who was the first officer to

23   arrive?

24   A    I believe it was Ben Kroutil.

25   Q    Now Officer Kroutil testified that he came

1    running down F Street.  Do you recall seeing him

2    running down F Street?

3    A    No.

4    Q    All right.  When Officer Kroutil arrived,

5    what did he do?

6    A    He came up to my side and -- he came up to my

7    side.

8    Q    All right.  And what happened?

9    A    I told him that Mr. Holcomb was under arrest.

10   Q    What was Mr. Holcomb doing?

11   A    Standing there, refusing to get in the car

12   like I told him.

13   Q    He was talking when Officer Kroutil was

14   there?

15   A    I don't recall exactly what he was saying.

16   I --

17   Q    Was he talking?  Yes or no?

18   A    Probably.

19   Q    OK.  So then what happened?

20   A    Then I grabbed his right hand.  And also

21   Kroutil grabbed his left.  And we walked him over

22   to the patrol car.

23   Q    And you grabbed him?

24   A    Yes.

25   Q    Do you recall in your Answers to

1    Interrogatories that you said you did not grab
2    him?
3    A    Well, I -- I held on to his right hand.  I
4    wouldn't necessarily -- it depends on what your
5    definition of "grab" is.
6    Q    OK.  So did he resist in any way when you
7    grabbed him this second time?
8    A    No, not necessarily.
9    Q    Well, OK.  What did he do that made -- that
10   made it not an unequivocal?  Did he not resist?
11   A    Well, I grabbed his right hand.  Officer
12   Kroutil grabbed his left.  And we instructed him
13   to walk over to the car.  He didn't comply.
14   Q    How did he not comply?
15   A    He didn't walk to the car.
16   Q    What did he do?
17   A    Nothing.
18   Q    He just stood there?
19   A    Yes.
20   Q    All right.  So what did you do?
21   A    Kroutil and I both walked him over to the
22   car.
23   Q    OK.  So if he was -- so you had to drag him?
24   A    No.
25   Q    Well then, what was it that he -- how was it

DEPOSITION OF JERRY RAMAR        267

1    he wasn't walking?  I'm trying to understand.

2    A    We didn't have to use any force to move him

3    or necessarily -- it wasn't necessarily use force.

4    But we did have to put pressure on him to say,

5    "Come on", like a toddler.  Say it's like a

6    toddler that you're trying to get to walk.  We're

7    going to walk one way or another.

8              And he, he eventually walked over to the

9    car.

10   Q    How much time did he delay?

11   A    Minimal.

12   Q    Ten seconds?

13   A    That would be a good approximation.

14   Q    OK.  Now at this time, was he -- did he tell

15   you at all that he had any sort of a disability?

16   A    No.

17   Q    Did he walk like he had any mobility issues

18   as you were escorting him to the police vehicle?

19   A    No.

20   Q    Did you not have to hold his weight?

21   A    We had to move his weight, but not -- only

22   because he was resisting.

23   Q    OK.  So how did you know, as you sit here

24   today, how do you know that he was resisting as

25   opposed to having an orthopedic issue?

                    DEPOSITION OF JERRY RAMAR        268

1    estimate of how many officers were present?

2    A    Where?

3    Q    Once you -- in the vicinity, at the scene,

4    for want of a better term.

5    A    OK.  I want to clarify that because I didn't

6    know if you meant how many officers were at the

7    car or at the whole scene.

8    Q    At the whole scene?

9    A    I don't recall.

10   Q    Was Sergeant Applegate present by the time

11   you got Mr. Holcomb to the black and white?

12           MR. LOEBS:  Objection.  Calls for

13   speculation.

14   Q    BY MR. BOSKOVICH:  If you know.

15   A    I don't know.

16   Q    So you get Mr. Holcomb to the black and

17   white, to the car.  What did you do?

18   A    We get him to the car and handcuffed him.

19   Q    How did you do that?

20   A    I put a handcuff on his one hand that I was

21   holding, and Ben had the other hand, and

22   handcuffed -- well, put it on his right wrist, not

23   his hand.  And then put the other handcuff on

24   the -- on the other wrist.

25   Q    Was the handcuffing without incident?

1    A    Yes.

2    Q    He was compliant?

3    A    Yes.

4    Q    At this point, was he -- was he still

5    yapping?

6    A    At this point, after we got the handcuffs on

7    him, that's when he went limp.  I don't know if he

8    was yapping or not.

9    Q    So when you put the handcuffs on him he was

10   standing erect?

11   A    Not necessarily completely erect.

12   Q    OK.  So was he bent over towards the hood of

13   the -- of the police car?

14   A    Slightly.

15   Q    Did he do that voluntarily or -- or was he

16   assisted by an officer?

17   A    I would consider it voluntarily.

18   Q    So nobody put his hand on his head and pushed

19   him down?

20   A    Oh, absolutely not.

21   Q    OK.  So you got him handcuffed.  Then what

22   happened?

23   A    That's when he went limp.  And I was on the

24   right side.  I tried to prohibit him from falling.

25   And he slid along the front of the car.  He's a

1     heavy man.  I've only got 185 pounds to stop him.

2     There's no way I'm going to stop him.

3            So Ben and I did what we could to keep

4     him from falling onto the ground.  He went on to

5     his side and then rolled over.  Went on to his --

6     I don't remember what side he went to.  And then

7     remained on the ground.

8     Q    Did he hit his head?

9     A    No.

10    Q    Now, when you cuffed him, I can't remember,

11    were you on his right side?

12    A    Yes.

13    Q    And was he facing the -- the -- the patrol

14    car when you handcuffed him?

15    A    Yes.

16    Q    And when he slid down the police car, was he

17    sliding towards you or towards Ben Kroutil?

18    A    Towards me.  Towards the front.

19    Q    OK.  So towards --

20    A    Because the car slopes that way.

21    Q    All right.  Was he actually leaning on the

22    hood?  Was a part of his body touching the hood,

23    his torso?

24    A    No.

25    Q    All right.  So he slid semi erect towards

                    DEPOSITION OF JERRY RAMAR          275

1

2

3           I, HOWARD SCHROEDER, C.S.R. #1123, a

4   Certified Shorthand Reporter for the State of

5   California, do hereby certify:

6          That prior to being examined, the

7   witness named in the foregoing deposition was by

8   me duly sworn to testify to the truth, the whole

9   truth and nothing but the truth;

10         That said deposition was taken down

11   by me in shorthand at the time and place therein

12   named, and thereafter reduced to computerized

13   transcription under my direction and supervision.

14   And I hereby certify the foregoing transcript is a

15   full, true and correct transcript of my shorthand

16   notes so taken.

17         I further certify that I am not

18   interested in the outcome of this action.

19         Witness my hand this_____ day

20   of _____, 2015.

21

22                _____

                  Howard Schroeder, CSR #1123

23              State of California

24

25

DEPOSITION OF JERRY RAMAR     306