1
2
3
4
5          **UNITED STATES DISTRICT COURT**
6          **EASTERN DISTRICT OF CALIFORNIA**
7

8  **HARVEY HOLCOMB,**                      **CASE NO. 1:13-CV-1102 AWI SKO**

9               **Plaintiff**

10         **v.**                           **ORDER ON DEFENDANTS' MOTION
                                            FOR SUMMARY JUDGMENT**
11 **JERRY RAMAR, et al.,**

12              **Defendants**               **(Doc. No. 51)**

13

14

15         This is a civil rights case that arises out of a confrontation between Plaintiff Harvey

16 Holcomb ("Holcomb") and members of the City of Modesto Police Department, Defendants Jerry

17 Ramar ("Ramar"), Ben Kroutil ("Kroutil"), and Joseph Bottoms ("Bottoms").[1]  Holcomb alleges

18 claims under 42 U.S.C. § 1983 and 42 U.S.C. § 12132 against the Defendants.  Defendants move

19 for summary judgment on all claims alleged against them.  For the reasons that follow,

20 Defendants' motion will be granted in part and denied in part.

21

22               **SUMMARY JUDGMENT FRAMEWORK**

23         Summary judgment is proper when it is demonstrated that there exists no genuine issue as

24 to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

25 Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-

26 Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears

27

28 ───────────────
[1] The City of Modesto, and Officers Ciccarelli, Chandler, and Cox were also named as defendants, but subsequently
have been dismissed.  See Doc. Nos. 47, 59.

the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Herbert Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984. If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103. The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The opposing party's evidence is to be believed, and all justifiable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

(9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at 899.  "If conflicting inferences may be drawn from the facts, the case must go to the jury."  Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003).  Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  The parties have the obligation to particularly identify material facts, and the court is not required to scour the record in search of a genuine disputed material fact.  Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

## FACTUAL BACKGROUND[2]

On May 7, 2012 in the afternoon, Holcomb was driving his Toyota Rav4 in Modesto after having visited his workers' compensation attorney.  See Holcomb Depo. 79-81.  At the time, Holcomb was suffering from severe orthopedic and autoimmune disorders that severely limited and hindered his mobility/ability to walk.  See id. at 83-86.  Holcomb's step-son, Bryan Turner ("Turner"), was a passenger in the Toyota and was there to assist Holcomb in ambulating.  See id. at 81:10-25.  Holcomb had a wheelchair in the back of the Toyota, and the wheelchair was leaning up against the rear window in plain sight.  See Holcomb Dec. ¶ 2.

---

[2] "DUMF" refers to "Defendants' Undisputed Material Fact," and "PRDUMF" refers to "Plaintiff's Response to Defendants' Undisputed Material Fact."

1     The same day, Ramar was working as an undercover officer as part of a drug enforcement

2   unit.  See DUMF 1.  Ramar was dressed in plain clothes and was driving an unmarked police

3   vehicle.  DUMF 2.  At about 4:30 p.m., Ramar began to make a left turn to leave the Modesto

4   Police Department parking lot.  See id.  As Ramar was exiting the parking lot, he noticed a Toyota

5   Rav4 (which was being driven by Holcomb) traveling towards him.  DUMF 3.  Holcomb was

6   traveling 25 mph or less.  See Holcomb Depo. 97:25-98:5.  Because Ramar pulled out in front of

7   Holcomb, Holcomb slammed on his brakes to avoid hitting Ramar.  See Holcomb Depo. 104:1-8.

8   Ramar stared at Holcomb with a smirk and a strange look, and Holcomb swore at Ramar and made

9   a rude gesture.  See Holcomb Depo. 105-110.  After Holcomb "flipped off" Ramar, the look on

10   Ramar's face changed and it looked like Ramar "snapped."  See id. at 111:9-24.  Ramar pulled out

11   of Holcomb's path, and Holcomb drove ahead to a stop sign.  See DUMF's 5, 6; PRDUMF 5, 6.

12   As a result of the sudden stop, Turner's cellphone flew from his lap and went under the seat.[3]  See

13   Holcomb Depo. 114:21-25.

14     Holcomb stopped at the stop sign, and remained at the stop sign for only a few seconds.

15   See Holcomb Depo. 115:12-25.  A car was coming or had pulled up to the stop sign when

16   Holcomb moved; Holcomb did not want to block the road.[4]  See id.  Turner was unable to get his

17   cellphone.  See id. at 114:21-25.  Holcomb pulled forward, pulled to the right shoulder, see id.,

18   and stopped his car within a 18 inches of the curb, see Turner Depo. 18:13-21,[5] so that Turner

19   could retrieve his cellphone.  See Holcomb Depo. 114:21-15.  Holcomb's car was parallel to the

20   curb, but it was occupying the space of more than one marked diagonal parking space.  See

21   Holcomb Depo. 117:13-20; Ramar Dec. ¶ 4.

---

[3] Turner's deposition indicates that his cellphone had not slipped from his lap or fallen under the seat.  However, as the non-moving party, Holcomb's version of events is to be credited.  See Narayan, 616 F.3d at 899.  Therefore, for purposes of this motion, Turner's cellphone slid from his lap.

[4] Ramar declared that Holcomb held up traffic at the stop sign.  See DUMF 7.  Holcomb's testimony indicates that he was cognizant of other cars and was not impeding traffic.  Because this is summary judgment, all justifiable inferences will be made in favor of Holcomb.  See Narayan, 616 F.3d at 899.  Therefore, Holcomb was not holding up traffic for purposes of this motion.

[5] Defendants contend that Holcomb parked more than 18 inches from the curb.  See DUMF 8.  However, the deposition testimony of Bryan Turner indicates that Holcomb pulled up to the curb and was only "a few inches" from the curb.  Viewing the evidence in the light most favorable to Holcomb, see Narayan, 616 F.3d at 899, Holcomb's car was less than 18 inches from the curb.

Ramar made a u-turn, stopped his car in the intersection and behind Holcomb, and exited his vehicle.  See Ramar Dec. ¶ 5; Ramar Depo. 212:24-214:19.  As Turner opened his door, Holcomb looked in his side mirror and saw a man with his back against the Toyota, creeping towards Holcomb.  See Holcomb Depo. 117-122.  The man creeping along the side of the Toyota was the driver who had pulled out in front of Holcomb, i.e. Ramar.  See id. at 119:20-24.  Ramar was wearing nothing that would have identified him as a police officer.  See id. at 123:16-21; Turner Depo. 22:20-24.  Kroutil arrived and immediately came up beside Ramar.  DUMF 11.

Based on the expression on Ramar's face, Holcomb believed that Ramar was going to attack him, so Holcomb unbuckled his seat belt, opened the car door, and put one foot onto the ground in order to attempt to defend himself.  See Holcomb Depo. 124:6-23, 129:10-14, 133:18-134:9.  Holcomb noticed other officers arriving at the scene heading towards him.  See id. at 131:13-22.  Officers then grabbed Holcomb by his neck, throat, and hair (and anywhere else that they could get a hold of), and forcibly pulled Holcomb out of his car in such a manner that Holcomb believed that he was being attacked.[6]  See id. at 129:10-20; Turner Depo. 22:10-19.  Turner testified that the man who was walking along the side of the car "beat the shit out of [Holcomb]."  Turner Depo. 22:10-19.  Holcomb could not make out who was grabbing and pulling him out of his car.  See Holcomb Depo. 135:17-22.  Holcomb saw other police officers arriving and yelled "I won't resist" and "I am not resisting."  Holcomb Depo. 133:8-13.  Turner yelled at the officers that Holcomb was disabled and was not resisting.  See id. at 137:7-19.  Once the officers drug Holcomb out of his car, they placed him in control holds, and began to walk him towards the back of his car.  See id. at 138:3-19.  Holcomb was taking small steps and officers were partially supporting Holcomb's weight.  See Kroutil Depo. 223:7-224:24.  The officers then slammed Holcomb on the hood of a police car, and pinned Holcomb down, applied additional compliance holds to Holcomb's wrists, arms, and head/face, and struck Holcomb between five and fifteen times.  See id. at 138:3-139:14, 142:1-21, 143:5-24, 148:17-149:13.  The officers placed

---

[6] There is a genuine dispute of material fact with respect to the force used against Holcomb.  Ramar and Kroutil have declared that they used only minimal force to direct Holcomb to a patrol car and handcuff him.  See Ramar Dec. ¶ 6; Kroutil Dec. ¶ 2.  Holcomb's deposition testimony does not indicate that only minimal force was used.  As the non-moving party, Holcomb's evidence is credited for purposes of this motion.  See Narayan, 616 F.3d at 899.

1   handcuffs on Holcomb, without ordering Holcomb to place his hands behind his back.  See id. at

2   140:11-20, 154:25-155:7.  Three to four officers then picked Holcomb off of the hood of the car,

3   slammed him to the ground, and manipulated his body into a "hog tied" position.  See id. at

4   152:12-154:3.  Holcomb did not have the strength to resist the officers and never did resist the

5   officers.  See id. at 139:15-18, 154:4-11.  While he was "hog tied," an unknown officer had his

6   knee on Holcomb's back, and Holcomb was saying that he could not breathe and was not

7   resisting.  See id. at 156:9-157:6.  After Holcomb stopped moving or squiggling, the officer

8   stopped and rolled him over.  See id. at 157:1-6.  An officer had has knee on Holcomb's back in

9   order to keep Holcomb upright, which caused Holcomb discomfort.  See id. at 170:6-24.  Because

10  of his autoimmune condition, Holcomb was very sensitive to touch.  See id. at 172:2-22.

11      Officers told Holcomb that he needed to get up and walk, and Holcomb said that he could

12  not do so.  See id. at 164:23-165:4.  Holcomb requested an ambulance many times because of

13  what the officers had done to him.  See id. at 175:14-23.  An officer eventually asked Holcomb if

14  he was having a hard time breathing, and Holcomb stated that he was.  See DUMF 24.  Less than a

15  minute later, an officer informed Holcomb that an ambulance had been summoned.  See id.

16  Holcomb complained that the handcuffs were too tight and asked that they be removed or

17  loosened, but it felt to Holcomb that Bottoms tightened the cuffs by locking them in place.  See

18  Holcomb Depo. 208:24-209:16.  About 5 minutes after Holcomb was told that an ambulance was

19  on its way, a paramedic was at Holcomb's side.  See DUMF 24.

20      Paramedics found that Holcomb's blood pressure at one point was 189/108, but that

21  Holcomb was receiving sufficient oxygen.  See DUMF 25; Boskovich Dec. Ex. F.  Paramedics

22  informed the officers that Holcomb did not have acute shortness of breath, was not suffering from

23  anything life threatening, and that it was up to the officers whether to transport Holcomb to the

24  hospital or straight to jail.  See DUMF's 26, 28.  Holcomb was lifted from the street, put into his

25  wheelchair, and wheeled to jail.  See DUMF's 30, 31; Holcomb Depo. 208:4-15.  Holcomb was

26  criminally charged with violation of Penal Code § 148(a)(1), but the charges were eventually

27  dismissed.  See Boskovich Dec. Ex. E.

28

**DEFENDANTS' MOTION**

**I.      42 U.S.C. § 1983 -- False Arrest**

*Defendants' Arguments*

Defendants argue that Ramar observed Holcomb commit multiple offenses.  Ramar observed Holcomb drive at an unsafe rate of speed, observed Holcomb nearly hit his (Ramar's) vehicle, and heard Holcomb honk his horn as he passed by Ramar.  Holcomb's conduct constitutes a violation of Vehicle Code §§ 22350, 22352(b)(1), and 27001(b).  Ramar also observed Holcomb stop at a stop sign and remain there blocking traffic.  This violates Vehicle Code § 22400(a).  Ramar then observed Holcomb pull over and park parallel in an area marked for diagonal parking, and park more than 18 inches from the curb.  Holcomb also admits that he parked parallel in the diagonal parking spaces.  This conduct violates Vehicle Code §§ 22502(a) and 22508(b).  Furthermore, as Ramar approached Holcomb's car, he observed Holcomb exit his car and assume a fighting stance.  Ramar identified himself as a police officer and ordered Holcomb to return to his car, but Holcomb refused.  Holcomb's failure to obey Ramar constitutes a violation of Penal Code § 148(a)(1).  Because Ramar had probable cause to believe that Holcomb had committed a violation of the Penal Code and multiple violations of the Vehicle Code in his presence, Holcomb's arrest did not violate the Fourth Amendment.

Defendants also argue that Kroutil is entitled to summary judgment.  Ramar made the decision to arrest before Kroutil arrived.  Where an officer merely follows the orders of another officer to facilitate an arrest, and has no objective basis to believe that the arrest is improper, there is no liability for false arrest.  Kroutil merely followed Ramar's lead.

Defendants also argue that Bottoms arrived on the scene after Holcomb was arrested, detained, handcuffed, and on the ground.  That is, Bottoms played no role in Holcomb's arrest.

Finally, Defendants argue in the alternative that they are entitled to qualified immunity.  Ramar argues that he is entitled to qualified immunity because, based on his observations, a reasonable officer could believe that probable cause to arrest Holcomb.  Kroutil and Bottoms argue that they are entitled to qualified immunity because it was not clear at the time of the incident that an officer not involved in the decision to arrest can be liable for false arrest.

*Plaintiff's Opposition*

Holcomb argues that there was no probable cause to arrest him for any offense.  He was not resisting arrest because there was nothing to indicate that Ramar was an officer, and Holcomb was drug out of his car without warning or command.  Holcomb argues that he was not speeding, and simple math shows that Ramar had less than a second to calculate Holcomb's speed. Moreover, Ramar admitted that he could not give a reliable visual estimate of speed.  There was also no probable cause to arrest for impeding traffic, using a horn or stopping more than 18 inches from the curb.  Holcomb argues that the evidence shows that he was at the stop sign for only a few seconds, he was within a few inches of the curb when he stopped, and he never used his horn. Finally, there was no illegal parking because Holcomb had pulled over to let Turner out, and thus was only temporarily unloading a passenger.  Also, the parking violations are civil infractions that cannot form the basis of an arrest.

Holcomb also argues that Ramar is liable for ordering and effectuating his arrest, and Kroutil is liable for participating in the arrest by grabbing, dragging, and assisting in the handcuffing of Holcomb.  That is, Kroutil can be held liable for false arrest because he was an integral participant in the arrest.  However, Holcomb concedes that Bottoms was not an integral participant in the arrest, and thus is not liable.

Holcomb argues that qualified immunity is not appropriate because Defendants cite no cases that suggest Ramar's belief that probable cause was present was reasonable.  The statutes at issue have long been established and are clear.  Moreover, Ramar's mistake of fact with respect to speed were by his own admission unreasonable, and thus not protected from qualified immunity.

*Legal Standard*

1.   False Arrest

"The Fourth Amendment requires police officers to have probable cause before making a warrantless arrest."  Ramirez v. City of Buena Park, 560 F.3d 1012, 1023 (9th Cir. 2009); see Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004).  Probable cause to arrest exists if, "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that the defendant had committed a crime."

Conner v. Heiman, 672 F.3d 1126, 1132 (9th Cir. 2012); Beier, 354 F.3d at 1065.  The facts and circumstances that are analyzed "are those that were known to the officer at the time of the arrest." Rosenbaum v. Washoe County, 663 F.3d 1071, 1076 (9th Cir. 2011).  Facts learned or evidence obtained as a result of an arrest cannot be used to support probable cause unless they were known to the officer at the moment the arrest was made.  Allen v. City of Portland, 73 F.3d 232, 236 (9th Cir. 1996).  The facts known to the officers are then compared to the elements of the crime at issue.  Velazquez v. City of Long Beach, 793 F.3d 1010, 1018 (9th Cir. 2015).  A "mere mistake of fact" will not render an arrest illegal as long the mistake is reasonable and made in good faith. See Liberal v. Estrada, 632 F.3d 1064, 1077-78 (9th Cir. 2011); United States v. Miguel, 368 F.3d 1150, 1153-54 (9th Cir. 2004).  However, if an officer simply does not know the law, and makes an arrest based on objective facts that cannot constitute a violation, then the Fourth amendment is violated, i.e. "[p]robable cause cannot be established by an erroneous understanding of the law." Beier, 354 F.3d at 1065; see also Weinstein v. City of Eugene, 337 Fed. Appx. 700, 701 (9th Cir. 2009).  "[P]robable cause to believe that a person has committed any crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause."  Ewing v. City of Stockton, 588 F.3d 1218, 1230 n.19 (9th Cir. 2009).  "[If] an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).  This is so even when the state crime does not authorize an arrest and is punishable by a fine only.  Arkansas v. Sullivan, 532 U.S. 769, 771 (2001); Atwater, 532 U.S. at 323.  Even though an officer may violate state law by making an arrest for an "unarrestable" criminal offense, as long as the officer has probable cause to believe that a criminal offense was committed in his presence, the officer's violation of state law will not in turn violate the Fourth Amendment.  Virginia v. Moore, 553 U.S. 164, 176-78 (2008); Martinez-Medina v. Holder, 673 F.3d 1029, 1036-37 (9th Cir. 2011).

    2.    Qualified Immunity

    A court employs a tiered analysis for determining qualified immunity.  See Saucier v. Katz, 533 U.S. 194, 200-02 (2001); CarePartners LLC v. Lashway, 545 F.3d 867, 876 n.6 (9th Cir.

2008).  However, lower courts need not strictly follow the tiered sequence in analyzing qualified immunity, but instead have the discretion to dispose of the issue at step two without addressing step one.  Pearson v. Callahan, 555 U.S. 223, 236 (2009); Glenn v. Washington County, 673 F.3d 864, 870 (9th Cir. 2011).  Under the first step, the court determines whether, "taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right?"  Saucier, 533 U.S. at 201; Bingue v. Prunchak, 512 F.3d 1169, 1173 (9th Cir. 2008).  If the answer is "no," then the inquiry ends and the plaintiff cannot prevail; if the answer is "yes," the court continues the analysis.  See Saucier, 533 U.S. at 201; Bingue, 512 F.3d at 1173; Johnson v. County of L.A., 340 F.3d 787, 793-94 (9th Cir. 2003).  Under the second step, the court determines "whether the right was clearly established," and applies an "objective but fact-specific inquiry."  Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); see Saucier, 533 U.S. at 202.  The critical question is whether "the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates the right."  Saucier, 533 U.S. at 202; Inouye, 504 F.3d at 712.  Whether a right is clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition."  Saucier, 533 U.S. at 201; Bingue, 512 F.3d at 1173.  If the officer could have reasonably, but mistakenly, believed that his conduct did not violate a clearly established constitutional right, then the officer will receive qualified immunity.  See Saucier, 533 U.S. at 205-06; Johnson, 340 F.3d at 794.

> *Discussion*

> 1.    Bottoms

Holcomb concedes that Bottoms played no material role in his arrest.  See Doc. No. 55 at 13:27 n.11.  Therefore, summary judgment in favor of Bottoms on this claim is appropriate.  See Ramirez v. City of Buena Park, 560 F.3d 1012, 1026 (9th Cir. 2009).

> 2.    Ramar

There is no dispute that Ramar is the officer who made the decision to arrest Holcomb.  As indicated, Defendants have identified a number of offenses from the California Vehicle and Penal Codes that Holcomb may have committed.  The Court will examine each proffered offense separately.  See Velazquez , 793 F.3d at 1018.

### a.     California Vehicle Code § 27001

Vehicle Code § 27001 "restricts the use of a horn to occasions when it is necessary for safe operation or as a theft alarm system." Garcia v. NLRB, 785 F.2d 807, 808 n.1 (9th Cir. 1985). The California Attorney General has indicated that § 27001 is a "vehicular noise law." 55 Ops. Cal. Atty. Gen. 178, 181 n.11 (1972). Although Ramar has declared that Holcomb honked his horn after Ramar pulled out of Holcomb's path, see Ramar Dec. ¶ 3, Holcomb declared that he did not honk his horn. See Holcomb Dec. ¶ 3. As the non-moving party, the Court must credit Holcomb's version. See Narayan, 616 F.3d at 899. Therefore, Holcomb did not honk his horn. Because Holcomb did not honk his horn, there could be no probable cause to believe that Holcomb violated Vehicle Code § 27001.

### b.     California Vehicle Code §§ 22350 and 22352(b)(1)

Vehicle Code § 22350 is California's basic speed law, which essentially requires drivers to drive at a reasonable and prudent speed under the circumstances. See People v. Ellis, 69 Cal.App.4t h 1334, 1339 (1999). Vehicle Code § 22352 in part sets a prima facie speed limit of 25 m.p.h. in residence and business districts. See Cal. Veh. Code § 22352(b)(1). Here, probable cause regarding these two speeding laws is based on Ramar's estimation that Holcomb was driving about 35 m.p.h. in a 25 m.p.h. zone. See Ramar Dec. ¶ 3. However, Holcomb has testified that he was traveling 25 m.p.h. or less, see Holcomb Depo. 97:25-98:5, which the Court must accept as true. See Narayan, 616 F.3d at 899. Because Holcomb was traveling 25 m.p.h., he could not have been in violation of § 22352(b)(1). Further, Ramar has submitted no evidence that would suggest Holcomb violated § 22350 by traveling 25 m.p.h.

Nevertheless, probable cause may still exist if there is a reasonable mistake of fact. See Liberal, 632 F.3d at 1077-78. In this case, Holcomb's car appears to have been about 60 feet away from Ramar's car when Ramar saw Holcomb, and Ramar testified that he was startled to see Holcomb's vehicle coming at him (if Holcomb had not stopped he would have "t-boned" Ramar). See Ramar Depo. 156:19-23, 158:7-8. Ramar testified that he thought Holcomb was coming at him fast, and that he had less than a second to estimate Holcomb's speed. See id. at 157:18-22, 159:20-160:1. Ramar also testified that he had received approximately two hours of training on

how to visually estimate speed as part of a 24-hour police radar training course. See id. at 34:3-14, 36:6-13.

Viewing this evidence in the light most favorable to Holcomb, the Court cannot say as a matter of law that Ramar's mistaken belief as to Holcomb's speed was reasonable.   The Court finds particular significance to the fact that Ramar was startled, had a second or less to estimate Holcomb's speed, and the distance of 60 feet between the vehicles does not seem particularly great in relation to the speeds at issue.   These facts suggest a very short and stressful window in which to estimate speed.   Although Ramar had training with respect to visual estimations of speed, it does not appear to have been in a situation in which he could have been "t-boned."   Moreover, the Court has not been cited to any evidence that discusses when Ramar received his training, how often he would enforce speed limits, or importantly what his actual experience in visually estimating speed was.   Without more from Ramar, the Court can only conclude that there is a genuine disputed issue of material fact as to the reasonableness of Ramar's mistaken belief that Holcomb was speeding.   Cf. United States v. Sowards, 690 F.3d 583, 591 (4th Cir. 2012) (holding that the Fourth Amendment does not allow blanket approval for the proposition that an officer's speed estimate itself will always support probable cause, but that the question remains one of reasonableness); United States v. Ludwig, 641 F.3d 1243, 1247 (10th Cir. 2011) (recognizing that visual estimation can provide probable cause to support a stop in "appropriate circumstances," and that the defendant failed to offer reasons to discredit the estimate of a highly experienced highway patrol officer).

c.     Vehicle Code § 22400

Vehicle Code § 22400 in part prohibits vehicles from coming to a complete stop so as to "impede or block the normal and reasonable movement of traffic unless the stop is necessary for safe operation or in compliance with law." Cal. Veh. Code § 22400(a); People v. Hernandez, 219 Cal.App.3d 1177, 1184 (1990).  Ramar declared that Holcomb was heading west when Holcomb stopped at the stop sign for an extended period of time, and this extended stop prevented westbound traffic from getting through the intersection. See Ramar Dec. ¶ 4.  However, although Holcomb testified that he was stopped longer than usual for a typical stop, Holcomb also

1    explained that he was only stopped for a few seconds and that he moved his car as another vehicle

2    was coming up behind him because he did not want to block the road.  See Holcomb Depo.

3    115:12-25.  Similarly, Turner testified that they were at the stop sign until all of the cross traffic

4    had passed by.  See Turner Depo. 13:23-14:6.  Crediting Holcomb's evidence as true, see

5    Narayan, 616 F.3d at 899, there was no probable cause to believe that Holcomb had violated §

6    22400(a).  Holcomb was only at the stop sign for a few seconds longer than a typical stop, and he

7    did not actually block other westbound traffic.  Given the short duration of Holcomb's stop and

8    the fact that no cars were actually forced to wait unnecessarily, § 22400(a) was not violated.

9                    d.    California Penal Code § 148(a)(1)

10          Penal Code § 148 in pertinent part prohibits an individual from willfully obstructing or

11    delaying a peace officer in the discharge of his duties.  See Cal. Pen. Code § 148(a)(1); Young v.

12    County of L.A., 655 F.3d 1156, 1164 (9th Cir. 2012).  Penal Code § 148(a)(1) can be violated

13    when an individual refuses to follow the lawful instructions of a police officer.  See Young, 655

14    F.3d at 1164 (finding that the plaintiff violated § 148(a)(1) when he refused an officer's

15    instructions to re-enter a truck and instead sat on a curb and ate).  Ramar has declared that:  he was

16    wearing his raid vest which identified him as a police officer, he identified himself as a police

17    officer to Holcomb, Holcomb was out of his Toyota, Holcomb was in a fighting stance, and

18    Holcomb refused to get back into his Toyota and swore at Ramar despite Ramar repeatedly

19    commanding Holcomb to return.  See Ramar Dec. ¶¶ 4-6.  This conduct could constitute a

20    violation of § 148(a).  See Young, 655 F.3d at 1164.  However, Holcomb testified that:  there was

21    nothing indicating that Ramar was a police officer, Holcomb did not make it out of his car, and he

22    was grabbed in, and drug out of, his car without anyone identifying themselves as a police officer.

23    See Holcomb Depo. 123:16-21, 129:10-20, 134:18-135:5; Turner Depo. 22:10-24.  For purposes

24    of this motion, Holcomb's version of events is credited.  See Narayan, 616 F.3d at 899.  Therefore,

25    Ramar did not identify himself as a peace officer and, because Holcomb had not exited his car, he

26    could not have failed to obey commands to get back into his car.  Under Holcomb's version, there

27    is no probable cause to believe that he violated § 148(a)(1).

28

1          **e.**    **California Vehicle Code § 22508**

2         Vehicle Code § 22508 in part permits a local authority to adopt an ordinance for streets "to

3  be marked with white lines designating parking spaces and require vehicles to park within the

4  parking spaces." Cal. Veh. Code § 22508(b). There is no dispute that Holcomb stopped his car

5  parallel to the curb, and thus took up two parking places that were marked with diagonal lines.

6  See Holcomb Depo. 117:1-17; Ramar Dec. ¶ 4.

7         Holcomb argues that there is not probable cause to arrest because he was not parked.

8  Holcomb testified that he was not parking, but had only stopped to let Turner get out of the car

9  and then get the cell phone from under the seat. See Holcomb Depo. 117:3-24. Holcomb pulled

10 over parallel to the curb, and when Turner had opened the door and began to get out, that is when

11 Holcomb noticed Ramar at the back of the car. See Holcomb Depo. 117:3-118:6. Holcomb

12 argues that because it was only a temporary stop for Turner to get out, get the phone, and get back

13 into the car, the definition of "park" is not met. Viewing the evidence in the light most favorable

14 to Holcomb, the Court agrees.

15        The Vehicle Code defines the term "park" to mean "the standing of a vehicle, whether

16 occupied or not occupied, otherwise than temporarily for the purpose of and while actually

17 engaged in loading or unloading of merchandise or passengers." Cal. Veh. Code § 463. Viewed

18 in the light most favorable to Holcomb, see Narayan, 616 F.3d at 899, Holcomb's testimony is

19 consistent with a temporary loading and reloading of his passenger, which is not "parking" under

20 the Vehicle Code.[7] In contrast, no evidence explains why Ramar believed Holcomb was "parked,"

21 rather there is only a conclusory statement that Holcomb was "parked." See Ramar Dec. ¶ 4.

22        Based on Holcomb's testimony, the Court normally would hold that a genuine disputed

23 issue of material fact exists and deny summary judgment. However, Holcomb also argues that a

24 violation of § 22508(b) cannot form the basis of a valid arrest because it is not a crime.

25        As indicated above, that a criminal offense is very minor and does not provide for jail time,

26 see Atwater, 532 U.S. at 323, 354, or is a fine only offense, see Arkansas, 532 U.S. at 771, or is a

27

28   [7] In reply, Defendants argued that Holcomb was "parked" when he got out of his car in order to defend himself against Ramar. However, Holcomb did not actually get out of his car. See Holcomb Depo. 123:16-21, 129:10-20, 134:18-135:5. Moreover, Holcomb's conduct was in reaction to Ramar, who had not identified himself as a police officer.

"non-arrestable" criminal offense under state law, see Virginia, 553 U.S. at 176-78, does not make an arrest for violation of such a crime unconstitutional.  The Supreme Court has made clear that that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution . . . ."  Virginia, 553 U.S. at 176.  However, the key is that the conduct that the officer observes is a criminal offense.  See id.; Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (holding that the "subjective reason for making an arrest need not be the *criminal offense* as to which the known facts provide probable cause.") (emphasis added); Allen, 73 F.3d at 237 ("By its definition, probable cause can only exist in relation to criminal conduct.").  If the conduct observed does not constitute a crime, then a warrantless arrest for that conduct violates the Fourth Amendment.  See Beier, 354 F.3d at 1065; United States v. Wingle, 918 F.Supp.2d 524, 529 (E.D. Va. 2013); Smith v. Kelly, 2012 U.S. Dist. LEXIS 64584, *6, *15 (W.D. Wash. 2012); Bostic v. Rodriguez, 667 F.Supp.2d 591, 608-09 & n.6 (E.D. N.C. 2009).

In 1992, California passed Vehicle Code § 40200(a), which mandated "that 'any' non-misdemeanor parking violation 'is subject to a civil penalty' to be enforced through 'the civil administrative procedures set forth in this article.'"  United States v. Choudhry, 461 F.3d 1097, 1101 (9th Cir. 2006) (quoting Cal. Veh. Code § 40200(a)).  The California Attorney General has opined that, through enactment of § 40200(a), "[p]arking violations are now subject to civil administrative procedures and civil penalties . . .  rather than treatment as criminal infractions."  77 Ops. Cal. Atty. Gen. 130, 131 (1994).  "Legislative intent, California court decisions, and the interpretation of the California Attorney General all confirm that parking violations are '[n]o longer . . . treated as infractions within the criminal justice system; instead, they are treated as civil offenses subject to civil penalties and administrative enforcement.'"  Choudhry, 461 F.3d at 1101 (quoting Tyler v. County of Alameda, 34 Cal.App.4th 777, 780 (1995)); see also Love v. City of Monterey, 37 Cal.App.4th 562, 566-67 (1995).  In other words, "parking violations are not subject to criminal penalties and do not fall within the definitions of a 'crime' or 'public offense.' ( Pen. Code, §§ 15- 16.)."  82 Ops. Cal. Atty. Gen. 47, 49 (1999); cf. Damiano v. City & Cnty of San Francisco, 2014 U.S. Dist. LEXIS 161038, *8 (N.D. Cal. Nov. 14, 2014) (holding that the Sixth Amendment does not apply to parking violations because they are not crimes under § 40200(a)).

1    As applied to this case, there is no dispute that a violation of Vehicle Code § 22508(b) is

2  a non-misdemeanor parking offense.  Pursuant to Vehicle Code § 40200(a), Holcomb's failure to

3  "park" within the diagonal lines was at most a civil offense – it was not a crime.  See Cal. Veh.

4  Code § 40200(a); Choudhry, 461 F.3d at 1101; Tyler, 34 Cal.App.4th at 780; 82 Ops. Cal. Atty.

5  Gen. at 49; 77 Ops. Cal. Atty. Gen. at 131.  Because Holcomb's conduct did not constitute a

6  crime, as a matter of law there can be no probable cause to arrest him for "parking" across the

7  diagonal parking lines.  See Beier, 354 F.3d at 1065; Allen, 76 F.3d at 237; Damiano, 2014 U.S.

8  Dist. LEXIS 161038 at *8; Wingle, 918 F.Supp.2d at 529; Smith, 2012 U.S. Dist. LEXIS 64584 at

9  *6, *15; Bostic, 667 F.Supp.2d at  608-09 & n.6.

10    In reply, Defendants argue that the Ninth Circuit in Choudhry rejected Holcomb's

11  argument.  The Court does not agree.  Choudhry did not address or discuss the ability of a

12  California peace officer to arrest someone for a civil parking violation.  In Choudhry, two police

13  officers observed a car that was improperly parked in a no parking zone.  See Choudhry, 461 F.3d

14  at 1099.  The officers approached and illuminated the vehicle, which caused the vehicle's two

15  occupants to make themselves visible.  See id.  Soon thereafter, it was determined that the

16  vehicle's driver had a suspended license and outstanding arrest warrants, and that the other

17  occupant possessed marijuana and a handgun.  See id.  Both occupants were arrested based on this

18  information, but not for the parking violation.  See id.  The issue on appeal was whether police

19  officers could conduct an investigatory stop where there is reasonable suspicion of a civil parking

20  violation.  See id. at 1098.  The Ninth Circuit recognized that parking violations in California were

21  enforced through a civil administrative scheme, and that violations were subject to civil penalties,

22  but not criminal sanctions.  See id. at 1101.  The Ninth Circuit held that California peace officers

23  may conduct investigatory stops for the purposes of investigating whether a civil parking offense

24  has occurred.  See id. at 1098, 1104.  The Ninth Circuit reasoned that because parking violations

25  are part of the Vehicle Code, and California peace officers have the authority to enforce the

26  Vehicle Code, then pursuant to Whren v. United States, 517 U.S. 806 (1996), a California peace

27  officer can conduct an investigatory stop with respect to a civil parking violation.  See id. at 1103-

28  04.  As one district court has explained, "Choudhry stands for the proposition that police can

16

1   briefly detain people they suspect of violating civil laws that permit them to issue citations, and

2   that they may act accordingly if they lawfully uncover evidence of *criminal activity* during that

3   brief detention." Smith, 2012 U.S. Dist. LEXIS 64584 at *10 (emphasis added).  Because

4   *Choudhry* analyzed only a temporary investigatory detention and not an arrest, it is not

5   controlling. See id. (finding that *Choudhry* did not alter the conclusion that police officers cannot

6   arrest an individual for civil infractions that did not constitute crimes).

7        Defendants also argue that, under cases like *Cooper v. California*, 386 U.S. 58 (1967),

8   state law procedures or authorization under state law are not considered in assessing the

9   reasonableness of an arrest.  It is true that state law procedures or authorization for arrests do not

10  matter for purposes of the Fourth Amendment.  See Virginia, 553 U.S. at 176-78.   Instead, the

11  relevant inquiry is whether there was probable cause to believe that a criminal offense was

12  occurring in the officer's presence. See id. at 176.  Whether probable cause to arrest exists is

13  determined by reference to state law (absent a federal crime).  See Velazquez, 793 F.3d at 1018.

14  Here, the state law at issue shows that non-misdemeanor parking violations are not crimes at all.

15  As for *Cooper*, that case involved a police officer who attempted to justify the search of a car as

16  being authorized by a particular state law.  See Cooper, 386 U.S. at 60-61.  Here, there is no law

17  that expressly authorizes or prohibits an arrest for a non-misdemeanor parking offense.  Because

18  state law is being used to determine whether there was an actual criminal offense occurring, not

19  whether the arrest was "authorized" under a statutory scheme, no state procedural law is at issue.

20       In sum, there is a genuine dispute as to whether Holcomb was "parked" or "parking" for

21  purposes of § 22508(b), but the dispute is not material because this parking law is a civil

22  regulation, not a crime.  As § 22508(b) is not a crime, it cannot support probable cause to arrest.

23           f.     California Vehicle Code § 22502(a)

24       Vehicle Code § 22502 provides in part that "a vehicle stopped or parked upon a roadway

25  where there are adjacent curbs shall be stopped or parked with the right-hand wheels of the vehicle

26  parallel with and within 18 inches of the right-hand curb . . . ." Cal. Veh. Code § 22502(a).  In

27  other words, § 22502(a) is violated by stopping or parking a car more than 18 inches from a curb.

28  People v. Butler, 111 Cal.App.4th 150, 156 (2003).  Ramar declared that Holcomb did not park his

car within 18-inches of the curb.  See Ramar Dec. ¶ 4.  However, Turner testified that Holcomb was "just a few inches" from the curb/"just a little bit" away from the curb.  See Turner Depo. 18:17-21.  Turner also testified that one can get a ticket for illegally parking, so drivers are to "pull all the way up to the curb so that your tires are touching the curb."  Id. at 18:11-16.  Viewing this evidence in the light most favorable to Holcomb, see Narayan, 616 F.3d at 899, Holcomb was not more than 18 inches from the curb.[8]

Although there is a genuine disputed issue of fact whether Holcomb was stopped more than 18 inches from the curb, the dispute is not material.  Like Vehicle Code § 22508(b), Vehicle Code § 22502(a) is a non-misdemeanor parking violation that falls within the purview of Vehicle Code § 40200(a).  Therefore, a violation of § 22502(a) is a civil infraction that is not a crime.  As a matter of law, there can be no probable cause to arrest Holcomb for stopping more than 18 inches from the curb.  See Beier, 354 F.3d at 1065; Allen, 76 F.3d at 237; Damiano, 2014 U.S. Dist. LEXIS 161038 at *8; Wingle, 918 F.Supp.2d at 529; Smith, 2012 U.S. Dist. LEXIS 64584 at *6, *15; Bostic, 667 F.Supp.2d at 608-09 & n.6.

g.    Qualified Immunity

There are factual disputes as to all of the identified offenses.  Accepting Holcomb's version of events as true, see Jeffers v. Gomez, 267 F.3d 895, 903 (9th Cir. 2001), there was not probable cause to arrest Holcomb, and a reasonable officer would have known that there was not probable cause to believe that Holcomb was violating Penal Code  § 148(a)(1) or most of the identified Vehicle Code sections.  With respect to speeding, the evidence does not establish that Ramar's estimation was reasonable or that he made a reasonable mistake of fact.  Because of factual disputes, qualified immunity with respect to probable cause is not appropriate.

Additionally, as to Vehicle Code § 22508(b) and § 22502(a), it has been the law post-1992 that parking violations are treated as civil infractions outside of the criminal justice system.  In 1999, the California Attorney General opined that non-misdemeanor parking infractions are not crimes.  See 82 Ops. Cal. Atty. Gen. 47, 49 (1999).  In 2006, Choudhry acknowledged this history.

---

[8] Holcomb argues that he was not "parked" when he pulled over.  However, § 22502(a) prohibits both parking and stopping more than 18 inches from a curb.  Since there is no dispute that Holcomb had stopped, whether he was parked is irrelevant for purposes of § 22502(a).

1   While *Choudhry* held that because peace officer could enforce the entire Vehicle Code that they

2   could also conduct temporary investigatory detentions, *Choudhry* did not hold that an arrest could

3   be based on a violation of a civil parking code.  Further, while *Atwater* and *Virginia* show that

4   even a minor fine-only criminal offense can form the basis for a constitutional arrest, these cases

5   indicated that the conduct at issue still had to be a criminal offense.  See <u>Virginia</u>, 553 U.S. at 176;

6   <u>Atwater</u>, 532 U.S. at 354.  Finally, the Ninth Circuit has held that qualified immunity is not

7   available when an officer makes a mistake of law.  See <u>Beier</u>, 354 F.3d at 1065.  Ramar cites no

8   cases that have upheld as constitutional an arrest based on a conduct that did not constitute a crime

9   within the relevant jurisdiction.

10      Ramar does cite *Lowe v. Spears*, 2009 WL 1393860, *4 (S.D. W. Va. May 15, 2009), as an

11  example in which courts have declined to draw a distinction between "fine-only traffic offenses"

12  and "fine-only parking violations."  However, neither this Court nor *Lowe* is a making a

13  distinction between "fine-only traffic offenses" and "fine-only parking violations."  This Court is

14  making a distinction between conduct that is a crime and conduct that is not a crime.  *Lowe* is

15  perfectly in line with that distinction.  Relying on *Atwater*, the *Lowe* court held that there was

16  probable cause to arrest because the parking violation witnessed by the officer was a

17  misdemeanor, i.e. a crime.  See <u>Lowe</u>, 2009 WL 1393860 at *4.

18      Defendants' motion also cited Modesto Municipal Code ("MMC") § 3-2.1001 as part of

19  their argument that Holcomb violated Vehicle Code § 22508(b).  See Doc. No. 51 at 12:16-17.

20  The citation is a "see also" citation, and it purports to quote part of MMC § 3-2.1001.  See <u>id.</u>  In

21  their reply, Defendants cite MMC § 1-2.01, and assert that this section makes a violation of MMC

22  § 3-2.1001 an "infraction."  See Doc. No. 56 at p.13.  Defendants argue that the municipal code

23  could be a source of confusion for purposes of qualified immunity because MMC § 3-2.1001 is a

24  "criminal infraction."  The Court is not persuaded.

25      First, the MMC was barely a part of Defendants' motion, and it was not addressed at all in

26  Holcomb's opposition.  The Court does not believe that a mere "see also" citation is sufficient to

27  fairly place the MMC into issue.  Similarly, MMC § 1-2.01 was cited only in reply.  Holcomb has

28  not had an opportunity to respond to arguments regarding that provision of the MMC.

1    Second, although not discussed by Defendants, the Ninth Circuit has recognized that when

2   an officer "acts in reliance on a duly-enacted statute or ordinance [he] is ordinarily entitled to

3   qualified immunity." Grossman v. City of Portland, 33 F.3d 1200, 1209 (9th Cir. 1994).

4   However, the Ninth Circuit has also indicated that qualified immunity may not apply when federal

5   or state cases establish that a statute or ordinance may not be applied in the challenged manner.

6   See Center for Bio-Ethical Reform, Inc. v. Los Angeles Cnty Sheriff Dep't, 533 F.3d 780, 794

7   (9th Cir. 2008); Dittman v. California, 191 F3d 1020, 1027 (9th Cir. 1999).  Here, assuming that

8   MMC § 1-2.01 would otherwise make Holcomb's parallel parking in diagonal parking spaces a

9   criminal infraction, it appears that MMC § 1-2.01 was enacted in 1990.[9]  Two years later in 1992,

10  the legislature enacted Vehicle Code § 40200(a).  As discussed above, it has been accepted that

11  with the enactment of § 40200(a), parking offenses in California became non-criminal matters.

12  See Choudhry, 461 F.3d at 1101.  Of particular note is the 1999 California Attorney General

13  Opinion, in which the Attorney General concluded that parking violations are not "crimes" or

14  "public offenses" under Penal Code § 15 and § 16.  See 82 Ops. Cal. Atty. Gen. 47, 49 (1999).

15  Penal Code § 16 states that "crimes and public offenses" include:  "1. Felonies; 2. Misdemeanors;

16  and 3. Infractions."  Thus, if parking parallel in diagonal parking spaces would have been a

17  criminal infraction in 1990, it was no longer a criminal infraction after 1992.  Ramar cites no

18  authority that suggests it is reasonable to rely on MMC § 1-2.01 so as to view Holcomb's conduct

19  as a crime, in light of Vehicle Code § 40200(a), post-1992 judicial decisions such as *Choudhry*

20  and *Tyler*, and opinions by the California Attorney General.  Cf. Center for Bio-Ethical Reform,

21  533 F.3d at 794.  Without more, Ramar has not shown that he is entitled to qualified immunity

22  based on the MMC.

23    Given the arguments and evidence presented, the Court cannot hold that a reasonable

24  officer in Ramar's position would have believed that arresting Holcomb for violating a purely

25  civil/non-criminal parking provision was lawful.  See Smith, 2012 U.S. Dist. LEXIS 64584 at *15-

26  *16.  Qualified immunity for an arrest based on a violation of § 22502(a) or § 22508(b) is

27  improper.

---

[9]The Court found § 3-2.1001 and § 1-2.01 at:  www.municode.com/library/#!/ca/modesto/codes/code_of_ordinances.

h.      Conclusion

The evidence presented shows that there are many genuinely disputed issues of material fact with respect to the Penal Code and Vehicle Code provisions identified by Defendants.  The factual disputes are such that qualified immunity cannot be granted.   With respect to Vehicle Code § 22502(a) and § 22508(b), however, the disputed facts are not material because Holcomb could not be arrested for violating these non-criminal parking provisions. Qualified immunity with respect to these two Vehicle Code sections is not appropriate because it is unclear how a reasonable officer could have concluded that it was lawful to arrest a person for conduct that does not constitute a crime.  Therefore, summary judgment in favor of Ramar is inappropriate.

3.      Kroutil

Generally, an officer may be liable for constitutional violations during an arrest if the officer was an integral participant in the arrest.  See Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12 (9th Cir. 2007); cf. Torres v. City of L.A., 548 F.3d 1197, 1206 (9th Cir. 2008) (". . . Detective Hickman was not present when Torres was arrested, and there is no evidence that Detective Hickman instructed the other detectives to arrest Torres or that any of those detectives consulted with her before making the arrest.  Thus, there is no evidence of 'integral participation' in the alleged constitutional violation.").  However, if an "officer has an objectively reasonable, good faith belief that he is acting pursuant to proper authority, he cannot be held liable if the information supplied by other officers turns out to be erroneous."  Torres, 548 F.3d at 1212; see also United States v. Robinson, 536 F.2d 1298, 1299 (9th Cir. 1976) (holding that a "facially valid direction from one officer to another to stop a person or a vehicle insulates the complying officer from assuming personal responsibility or liability for his act done in obedience to the direction.").

Here, the claim at issue is false arrest, i.e. an arrest without probable cause.  See Beier, 354 F.3d at 1064.  Kroutil admitted that he assisted Ramar in taking Holcomb over to a police car and handcuffing Holcomb.  See Kroutil Dec. ¶ 3.  Thus, Kroutil appears to have integrally participated in Holcomb's arrest.  See Torres, 548 F.3d at 1206; Blankenhorn, 485 F.3d at 481 n.12.  However, Kroutil also declared that "Ramar informed me that Mr. Holcomb was under arrest and asked me to assist him in detaining Mr.  Holcomb.  Officer Ramar, not me, made the decision to arrest

Holcomb for behavior that occurred prior to my arrival." Kroutil Dec. ¶ 2. There is no evidence that contradicts this assertion. Officers often come to the assistance of each other when requested, and Ramar's request to assist in Holcomb's arrest does not appear to be facially invalid. Holcomb does not explain why Ramar's direction to Kroutil was either objectively unreasonable or facially invalid, rather he only argues that Kroutil integrally participated in the arrest. See Torres, 548 F.3d at 1212; Robinson, 536 F.2d at 1299. That probable cause to arrest may not have actually existed does mean that Kroutil is liable for false arrest. See id. Without more from Holcomb, the evidence shows that Kroutil acted pursuant to a reasonable and facially valid request for assistance in making an arrest. Summary judgment in favor of Kroutil on this claim is appropriate.[10] See id.

## II.    42 U.S.C. § 1983 – Excessive Force

### *Defendants' Argument*

With respect to Ramar and Kroutil, Defendants argue that these officers are entitled to summary judgment because the evidence shows that the only contact they had with Holcomb was taking Holcomb's hands to be placed in handcuffs, escorting Holcomb to the police vehicle, placing Holcomb in handcuffs, and then guiding Holcomb to the ground as he slumped off of the hood of the police cruiser. Ramar and Kroutil had no other physical contact with Holcomb, and the conduct they did have does not amount to excessive force. Further, Holcomb has admitted that he could not tell "who was doing what," and does not know which officers struck him or pinned him to the hood of the police car. Merely because Ramar and Kroutil were present is not a basis for holding them liable. There is no evidence linking Ramar or Kroutil to any use of force against Holcomb. Without a link to any allegedly excessive force by either Ramar or Kroutil, summary judgment should be granted. Alternatively, qualified immunity is appropriate because it would not be clear to a reasonable officer on the scene that, having not observed any force, and having not participated in any force, that Ramar or Kroutil acted unlawfully.

With respect to Bottoms, Defendants argue that he did not arrive on the scene until after

---

[10] This conclusion does not affect Holcomb's excessive force claims. "Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice versa." Beier, 354 F.3d at 1064.

Holcomb had been handcuffed, and that he did not strike or use control holds against Holcomb. No evidence links Bottoms to a use of force against Holcomb, and merely being at the scene is insufficient.  Alternatively, qualified immunity is appropriate because it would not be clear to a reasonable officer on the scene that, having not observed any force, and having not participated in any force, that Bottoms acted unlawfully.  Further, in reply, Defendants argue that Bottoms did not tighten Holcomb's handcuffs.  Bottoms declared that he loosened the handcuffs after Holcomb complained that they were tight.  A video of the scene shows that although Holcomb exhibits momentary discomfort after Bottoms manipulated the handcuffs, Holcomb did not complain that the handcuffs had been tightened or complain for the remainder of the video about discomfort to his hands.  In fact, Holcomb did not complain to the paramedic who arrived on scene that his hands or wrists hurt.  Thus, the video evidence is inconsistent with the position that Bottoms actually tightened the handcuffs.

*Plaintiff's Opposition*

Holcomb argues summary judgment should not be granted as to any officer.  First, Holcomb argues that his testimony and the admissions of Kroutil and Ramar are sufficient for a jury to conclude that these two officers used excessive force.  Both Ramar and Kroutil admit that they had physical conduct with Holcomb, and admit that they were involved in the handcuffing process that ended with him on the ground.  Holcomb agrees that these officers touched him, and the only dispute is the amount of force.  Holcomb argues that his testimony shows among other things that he was pulled from his car, drug to a patrol car, slammed into the hood, and thrown to the ground.  No force was necessary because Holcomb was doing nothing illegal or resisting.

Second, Holcomb argues that Bottoms engaged in excessive force because Bottoms tightened Holcomb's handcuffs.  Holcomb argues that he complained that the handcuffs were too tight, and the video confirms that Bottoms's conduct caused pain.  This is not consistent with Bottoms's declaration that he loosened the handcuffs.

*Legal Standard*

All claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under

the Fourth Amendment and its standard of objective reasonableness. See Scott v. Harris, 550 U.S. 372, 381-83 (2007); Graham v. Connor, 490 U.S. 386, 395 (1989). The pertinent question in excessive force cases is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." Graham, 490 U.S. at 397; Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007). The objective inquiry into reasonableness is highly fact specific. See Scott, 550 U.S. at 383; Wilkinson v. Torres, 610 F.3d 546, 551 (9th Cir. 2010). "We first assess the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors." Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007). Factors that are considered in assessing the government interests at stake include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396; Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010); Davis, 478 F.3d at 1054. "In some cases . . ., the availability of alternative methods of capturing or subduing a suspect may be a factor to consider." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005); see Luchtel, 623 F.3d at 980. However, a reasonable use of force "encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable." Wilkinson, 610 F.3d at 551. It may also be appropriate to consider the parties "'relative culpability,' i.e. which party created the dangerous situation and which party is more innocent, may also be considered." Espinosa v. City & County of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010); see Scott, 550 U.S. at 384. Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; Wilkinson, 610 F.3d at 550. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97; Wilkinson, 610 F.3d at 550. "Force is excessive when it is greater than is reasonable under the circumstances." Santos v. Gates, 287 F.3d 846, 854 (9th Cir. 2002).

1    "A person subjects another to the deprivation of a constitutional right, within the meaning

2    of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to

3    perform an act which he is legally required to do that causes the deprivation of which complaint is

4    made." Preschooler II v. Clark County Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th Cir. 2007);

5    Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  As such, a plaintiff cannot hold an officer

6    liable "because of his membership in a group without a showing of individual participation in the

7    unlawful conduct." Jones v. Williams, 297 F.3d 930, 935 (9th Cir. 2002); Chuman v. Wright, 76

8    F.3d 292, 294 (9th Cir. 1996).  That is, an officer cannot be liable merely because he was present

9    at the scene of an unconstitutional act. Jones, 297 F.3d at 936; Chuman, 76 F.3d at 294.  Instead, a

10   plaintiff must establish either an officer's personal involvement or the officer's "integral

11   participation" in the alleged constitutional violation. Jones, 297 F.3d at 935-36; see also Torres v.

12   City of Los Angeles, 548 F.3d 1197, 1206 (9th Cir. 2008).  "Integral participation" requires "some

13   fundamental involvement in the conduct that allegedly caused the violation." Blankenhorn v. City

14   of Orange, 485 F.3d 463, 481 n.12 (9th Cir. 2007); see Torres, 548 F.3d at 1206.  However,

15   "'integral participation' does not require that each officer's actions themselves rise to the level of a

16   constitutional violation." Boyd v. Benton County, 374 F.3d 773, 780 (9th Cir. 2004).  In the

17   context of excessive force, a plaintiff's inability to identify which defendant performed which

18   specific act is not necessarily fatal, so long as some evidence supports an inference that a

19   particular officer was involved and exerted some force. See Lolli v. County of Orange, 351 F.3d

20   410, 417-18 (9th Cir. 2004); Rutherford v. City of Berkeley, 780 F.2d 1444, 1448 (9th Cir. 1986).

21   *Discussion*

22   1.    Bottoms

23   Holcomb's claim against Bottoms is based on Bottoms allegedly tightening Holcomb's

24   handcuffs.  It is well established in the Ninth Circuit that tight handcuffing can constitute

25   excessive force under the Fourth Amendment. Luchtel, 623 F.3d at 989; Wall v. County of

26   Orange, 364 F.3d 1107, 1112 (9th Cir. 2004); LaLonde v. County of Riverside, 204 F.3d 947, 960

27   (9th Cir. 2000).

28   Here, there is no dispute that Holcomb complained about being handcuffed.  Bottoms

25

1   declared that when Holcomb said that the handcuffs were causing discomfort, Bottoms

2   "immediately loosened the handcuffs."  Bottoms Dec. ¶ 4.  In contrast, Holcomb testified that it

3   felt like Bottoms tightened the handcuffs by locking them in place.  See Holcomb Depo. 208:24-

4   209:16.  A video of part of the encounter between Holcomb and the Modesto police officers

5   captures the relevant event between Holcomb and Bottoms.  In the video, Holcomb at various

6   times asks for his handcuffs to be taken off because he was not a threat to the officers.  See Kroutil

7   Dec. Ex. A.  Holcomb then told the officers that he could not feel his hands.  See id.  Bottoms then

8   leaned down and manipulated the handcuffs.  See id.  As Bottoms did so, the video shows

9   Holcomb shout "ow" and yell "my hands" and "please guys, please," several times.  See id.

10  Holcomb's feet started twitching, his breathing seems to have become more labored, his voice

11  became higher, and he told the officers that he has severe problems.  See id.  Ambulance sirens are

12  then heard, and an officer informed Holcomb that the ambulance was coming.  See id.  Between

13  one and two minutes after Bottoms adjusted the handcuffs, a paramedic arrives and asks if

14  Holcomb is having trouble breathing.  See id.  Holcomb informed the paramedic *inter alia* that he

15  had high blood pressure, he could not breath, and his whole body hurt.  See id.  As the paramedic

16  attempted to take Holcomb's blood pressure, Holcomb told the paramedic that he could not feel

17  his hands.  See id.  The video ends shortly thereafter with Holcomb still sitting on the ground and

18  the paramedic talking with police officers.  See id.

19         The "issue of tight handcuffing is usually fact-specific and is likely to turn on the

20  credibility of the witnesses."  Luchtel, 623 F.3d at 989; LaLonde, 204 F.3d at 960.  Viewed in the

21  light most favorable to Holcomb, the video and Holcomb's testimony create a genuine disputed

22  issue of material as to whether Bottoms actually loosened the handcuffs.  Holcomb was sitting on

23  the ground and was not a threat to anyone present.  The video shows a significant change in

24  Holcomb's behavior after Bottoms adjusted the handcuffs.  Holcomb mentioned to the paramedic

25  that he could not feel his hands.  That Holcomb did not mention this first to the paramedic is

26  understandable because Holcomb's primary concern (based on his statements to the paramedic)

27  was his ability to breath and his blood pressure, both of which could represent more serious

28  conditions than painful wrists.  Although a jury would not necessarily be required to view the

videotape as establishing excessive force for tight handcuffing, the videotape could support such a conclusion.  Under these circumstances, summary judgment is improper.  See LaLonde, 204 F.3d at 960; Rutherford, 780 F.2d at 1448.

Defendants have cited several Ninth Circuit and district court cases in support of their argument that excessive force was not used.  These cases are distinguishable.  Unlike most of the cited cases, Holcomb repeatedly requested the removal of the handcuffs and complained about being unable to feel his hands both before and after Bottoms adjusted the handcuffs, including while talking to the paramedic.  Moreover, Holcomb's reaction during and after Bottoms's adjustment of the handcuffs is consistent with significant discomfort and pain.  These facts sufficiently indicate excessive force.  Thompson v. Lake, 607 Fed. Appx. 624, 625 (9th Cir. 2015).

2.      Ramar & Kroutil

Holcomb's version of events does not indicate that any force was necessary.  Holcomb was never resisting or fleeing, there is nothing to suggest that Holcomb was a danger to anyone, and there was no probable cause to believe that Holcomb had committed any crime.  Furthermore, Holcomb describes getting forcefully pulled from his car, having pressure/compliance holds used against him, being hit, being drug to a patrol car, being slammed on the hood of the patrol car, being handcuffed, being thrown to the ground, and being kneed while on the ground.  Holcomb's testimony clearly shows excessive force.

However, Holcomb also has testified that he believed three or four officers pulled him from his car and attacked him, he believed Ramar was present when physical contact was first made but he cannot be sure, and he does not know which officer was performing which acts.  See Holcomb Depo. 130:6-9, 135:17-22, 196:12-197:18.  Holcomb also declared that he cannot identify by name which officer delivered which blow.  See Holcomb Dec. ¶ 5.[11]  Defendants seize on this testimony, along with their own declarations that do not indicate a physical "attack" against Holcomb, and argue that they cannot be held liable for merely being present.

---

[11] Holcomb also declared that he believes that he can identify some or all of the officers that used force against him. See Holcomb Dec. ¶ 5.  Presumably, Holcomb means that he can identify an officer either in person or through a photograph.

Defendants are correct that they cannot be liable simply for being present at the scene. However, the Court agrees with Holcomb that there is sufficient evidence to link both Ramar and Kroutil to the excessive force described by Holcomb.

First, Turner testified that the person who was driving the "gold impala like" car that had pulled up behind Holcomb was the same person who came up the side of the Toyota, pulled Holcomb out of his Toyota, and then "beat the shit" out of Holcomb. See Turner Depo. 14:7-17, 22:10-23:24, 45:13-46:4, 58:8-23; see also Holcomb Depo. at 119:20-24. Because Ramar had pulled out in front of Holcomb, and had done a U-turn to follow Holcomb, see Ramar Dec. ¶¶ 2-4, it is reasonable to infer that the person described by Turner was Ramar. Turner's testimony, combined with Ramar's declaration, is sufficient to show Ramar's personal involvement in excessive force against Holcomb.

Second, Ramar and Kroutil have both declared that they "escorted" Holcomb from his car to the nearby patrol car. See Ramar Dec. ¶ 6; Kroutil Dec. ¶ 3. Ramar declared that Holcomb was placed on the hood of the patrol car and handcuffed, and Kroutil declared he assisted Ramar in handcuffing Holcomb. See id. Ramar and Kroutil declare that after Holcomb was handcuffed, Holcomb began to slump off of the hood of the patrol car to the ground, and they both tried stop the fall, but ultimately had to try and guide Holcomb as he fell to the ground. See Ramar Dec. ¶ 4; Kroutil Dec. ¶ 7. Neither Ramar nor Kroutil identify any other officer as having physical contact with Holcomb. This evidence shows that both Ramar and Kroutil were the officers who took Holcomb from his car, took him to the patrol car, placed him on the hood, and handcuffed him, and also were significantly involved in the process of Holcomb lying face down on the street. That is, the evidence shows Ramar and Kroutil had physical contact with Holcomb and participated in the key moments of the encounter. When Ramar and Kroutil's admissions are combined with Holcomb's description of the force that he experienced at the hands of unknown officers, see Narayan, 616 F.3d at 899, a jury could reasonably infer that Ramar and Kroutil were integral participants in the excessive force inflicted on Holcomb. See Lolli, 351 F.3d at 417-18 (holding that a detainee's testimony of being punched, kicked, and struck with a baton by deputies, along with deputies' admissions that they were involved in the altercation and exerted

1    some physical force against the detainee, was sufficient to create an "inference that the deputies

2    were integral participants in the alleged unlawful act."). Because the evidence is sufficient to link

3    Ramar and Kroutil to excessive force as at least integral participants, summary judgment is

4    improper.

5              3.    Qualified Immunity

6          With respect to Bottoms, although Bottoms states otherwise, Holcomb's testimony

7    indicates that Bottoms did not loosen the handcuffs, but actually made the handcuffs tighter. For

8    purposes of qualified immunity, the Court credits Holcomb's testimony. See Jeffers, 267 F.3d at

9    903. The Ninth Circuit had established that tightened handcuffs can constitute excessive force

10   well before 2012. See, e.g., LaLonde, 204 F.3d at 960. A reasonable officer would have known

11   that it was unlawful to tighten handcuffs when an individual is complaining about the handcuffs

12   and appears to be in distress. See id. The Court cannot grant Bottoms qualified immunity.

13         With respect to Ramar and Kroutil, their argument for qualified immunity is based on the

14   premise that they neither saw nor engaged in any excessive force. This is contrary to Holcomb's

15   description of the force he experienced, and it is that version of events that the Court credits. See

16   Jeffers, 267 F.3d at 903. Further, under Holcomb's version of events, the Court cannot say that

17   any amount of force was justified.  The law on both integral participation, e.g. Blankenhorn, 485

18   F.3d at 481 n.12, and excessive force, e.g. Santos, 287 F.3d at 853-54, were sufficiently well

19   established in 2012 that officers in Ramar and Kroutil's position would have known that none of

20   the force described by Holcomb was permissible. The Court cannot grant Ramar or Kroutil

21   qualified immunity.

22

23   **III.    42 U.S.C. § 12132 (ADA) – Wrongful Arrest & Failure To Accommodate**

24         Part of Defendants' summary judgment motion addressed Holcomb's claims under the 42

25   U.S.C. § 12132. However, on October 7, 2015, after all briefing on this motion had been

26   submitted, the parties filed a Rule 41(a)(1)(A)(ii) dismissal with prejudice of Officer Ciccarelli

27   and the City of Modesto. See Doc. Nos. 58, 59. Thus, the City of Modesto (as well as Officer

28   Ciccarelli) is no longer a party to this suit. See Fed. R. Civ. P. 41(a)(1); Yesh Music v. Lakewood

1    _Church_, 727 F.3d 356, 362 (5th Cir. 2013); _Wilson v. City of San Jose_, 111 F.3d 688, 692 (9th

2    Cir. 1997).  The Court previously dismissed Holcomb's § 12132 claims against all individual

3    officers without leave to amend because § 12132 creates liability against "public entities," not

4    against individual officers.  _See_ _Holcomb v. Ramar_, 2013 U.S. Dist. LEXIS 157833, *16-*17

5    (E.D. Cal. Nov. 1, 2013) (citing numerous cases).  Because the City of Modesto is no longer a

6    party, there are no longer any potentially viable claims under § 12132.  _See id._  Therefore,

7    Holcomb's § 12132 claims will be dismissed.  _See id._

8

9                                    **CONCLUSION**

10          With respect to the false arrest claims, summary judgment in favor of Bottoms will be

11   granted because he was not on the scene when the decision to arrest was made or when the arrest

12   was effectuated.  Summary judgment in favor of Kroutil will be granted because the evidence

13   indicates that he was following a request to help make an arrest, and Holcomb has presented no

14   evidence that the request was facially invalid or objectively unreasonable.  Summary judgment in

15   favor of Ramar will not be granted because the evidence (viewed in the light most favorable to

16   Holcomb) shows the absence of probable cause to arrest Holcomb for any crime.  Further, based

17   on Holcomb's version of events, a reasonable officer would have known that probable cause did

18   not exist.  Therefore, Ramar is not entitled to qualified immunity.

19          With respect to the excessive force claims, summary judgment in favor of Bottoms will not

20   be granted because the evidence (viewed in the light most favorable to Holcomb) shows that

21   Bottoms tightened Holcomb's handcuffs.  Summary judgment in favor of Ramar and Kroutil will

22   not be granted because the evidence (viewed in the light most favorable to Holcomb) shows that

23   these offices were at least integral participants in excessive force.  Further, Bottoms, Ramar, and

24   Kroutil are not entitled to qualified immunity because under Holcomb's version of events, a

25   reasonable officer would have known that the conduct of these officers was unlawful.

26          Finally, with respect to the 42 U.S.C. § 12132 claims, those claims can only be brought

27   against a public entity.  Since Holcomb has dismissed the only public entity defendant through a

28   Rule 41(a)(1) dismissal with prejudice, the Court also will dismiss Holcomb's § 12132 claims.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.     Plaintiff's 42 U.S.C. § 12132 claims are DISMISSED;

2.     Defendants' motion for summary judgment with respect to Plaintiff's 42 U.S.C. § 1983 false arrest claims against Officers Kroutil and Bottoms is GRANTED; and

3.     Defendants' motion for summary judgment is otherwise DENIED.

IT IS SO ORDERED.

Dated:   __October 20, 2015__        _____

                                    SENIOR DISTRICT JUDGE